UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **Kelly Andrade,** | |
| **Plaintiff,** | Civil Action No. 21-CV-5237 |
| **v.** | Hon. William F. Kuntz, II |
| **Cultural Care, Inc., Michael Esposito, and Danielle Esposito,** | ***ORAL ARGUMENT REQUESTED*** |
| **Defendants.** | Date of Service: December 10, 2024 |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR REMITTITUR, OR IN THE ALTERNATIVE, MOTION FOR NEW TRIAL ON THE ISSUE OF DAMAGES**

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   FACTUAL BACKGROUND..................................................................................1

    A.  Procedural Posture ..........................................................................................1

    B.  The Evidence at Trial .....................................................................................2

III.  LEGAL STANDARD.............................................................................................5

IV.   ARGUMENT ..........................................................................................................5

    A.  The Law Requires Remittitur of the Jury's Excessive Compensatory Damages Award or a New Trial on the Issue of Damages. ................................................................5

        1.  Applicable Legal Analysis for Remittitur of a Compensatory Damages Award. ...5

        2.  Plaintiff Established No More Than $19,770.75 in Economic Damages. ..............6

        3.  To the Extent the Jury Awarded Plaintiff Emotional Compensatory Damages, the Jury's Verdict is Excessive. ...............................................................7

            a)  The Compensatory Damages Award is Excessive When Compared to Similar Cases of Significant Distress. ................................................................8

            b)  Even if Plaintiff had Presented Evidence of "Egregious" Emotional Distress, the Compensatory Damages Award Would Still Be Excessive. ................................10

        4.  Under New York Law, the Verdict Must Be Reduced by the Amount of Plaintiff's Settlement with Co-Defendant Cultural Care. ....................................................13

    B.  The Punitive Damages Award is Excessive and Should Be Reduced. ..........................14

        1.  The $2,000,000 Punitive Damages Award Is Grossly Excessive and Arbitrary, and Thus Constitutes an Unconstitutional Deprivation of Property. ...................14

            a)  The Reprehensibility of the Defendant's Misconduct. .........................................15

            b)  The Punitive Damages Are Out of Line With the Appropriate Compensatory Award In This Case and Against the Weight of the Evidence of Plaintiff's Actual Harm. ..............................................................16

            c)  The Difference Between the Jury's Punitive Damages Award and the Civil and Criminal Penalties Authorized or Imposed in Comparable Cases Warrants Remittitur. ..............................................................16

        2.  The Punitive Damages Award Must Be Reduced Because It Constitutes a Disproportionately Large Percentage of Defendant's Net Worth. ......................21

    C.  A New Trial on the Issue of Damages Is Warranted Based On Plain Errors That Occurred During Trial, Which Affected Defendants' Substantial Rights And Inflamed The Passions Of The Jury. ..............................................................24

V.    CONCLUSION......................................................................................................25

i

# TABLE OF AUTHORITIES

Page(s)

Cases

*Angulo v. 36th Street Hospitality LLC*,
  2020 WL 4938188 (S.D.N.Y. July 31, 2020) ................................................................11, 13, 18
*Antoine v. Brooklyn Maids 26, Inc.*,
  489 F. Supp. 3d 68 (E.D.N.Y. 2020) ........................................................................... 8, 19
*Barkley v. United Homes, LLC*,
  848 F. Supp. 2d 248 (E.D.N.Y. 2012) ................................................................13, 14, 15
*BMW of North America, Inc. v. Gore*,
  517 U.S. 559 (1996) ........................................................................................................ 15
*Bouveng v. NYG Capital LLC*,
  175 F. Supp. 3d 280 (S.D.N.Y. 2016) ............................................................................... 5
*Caravantes v. 53rd Street Partners, LLC*,
  2012 WL 3631276 (S.D.N.Y. Aug. 23, 2012) .........................................................Passim
*Cole v. Foxmar, Inc.*,
  2024 WL 74902 (2d Cir. Jan. 8, 2024) ........................................................................ 5, 15
*DiSorbo v. Hoy*,
  343 F.3d 172 (2d Cir. 2003) ...................................................................................5, 17, 18
*Dufresne v. Duemler*,
  485 N.Y.S.2d 879 (N.Y. App. Div. 1985) ...................................................................... 25
*Garcia v. Comprehensive Ctr., LLC*,
  2019 WL 8274296 (S.D.N.Y. Nov. 21, 2019) ........................................................11, 13, 18
*Gutierrez v. Taxi Club Mgmt., Inc.*,
  2018 WL 3432786 (E.D.N.Y. June 25, 2018) ............................................................ 6, 10
*H.L., v. Baker*,
  2021 WL 5112577 (Wash. Super. Aug. 19, 2021) ........................................................... 9
*I. Appel Corp. v. Katz*,
  1999 WL 287370 (S.D.N.Y. May 6, 1999) ..................................................................... 2
*Kogut v. Cnty. of Nassau*,
  789 F.3d 36 (2d Cir. 2015) ............................................................................................. 24
*Koufakis v. Carvel*,
  425 F.2d 892 (2d Cir. 1970) ......................................................................................24, 25
*Lee v. Edwards*,
  101 F.3d 805 (2d Cir. 1996) ........................................................................................... 21
*Mathis v. United Homes, LLC*,
  607 F. Supp. 2d 411 (E.D.N.Y. 2009) ........................................................................... 13
*Menghi v. Hart*,
  745 F. Supp. 2d 89 (E.D.N.Y. 2010) ..........................................................................21, 22
*Offei v. Omar*,
  2012 WL 2086294 (S.D.N.Y. May 18, 2012) .........................................................9, 10, 19
*Pappas v. Middle Earth Condo. Ass'n*,
  963 F.2d 534 (2d Cir. 1992) ........................................................................................... 21
*Patterson v. Balsamico*,
  440 F.3d 104 (2d Cir. 2006) ........................................................................................21, 22
*Payne v. Jones*,
  711 F.3d 85 (2d Cir. 2013) ............................................................................................... 7
*Qorrolli v. Metro. Dental Assocs., D.D.S. - 225 Broadway, P.C.*,
  2022 WL 17689836 (S.D.N.Y. Dec. 15, 2022) .........................................................16, 18
*Raedle v. Credit Agricole Indosuez*,
  670 F.3d 411 (2d Cir. 2012) ............................................................................................. 5

*Ravina v. Columbia Univ.*,
  2019 WL 1450449 (S.D.N.Y. Mar. 31, 2019) .................................................................... Passim
*Rupert v. Sellers*,
  368 N.Y.S.2d 904 ............................................................................................................... 25
*Sawicka v. Catena*,
  79 A.D.3d 848 (N.Y. App. Div. 2010) ................................................................... 9, 10, 18
*Sharkey v. Lasmo (Aul Ltd.)*,
  55 F. Supp. 2d 279 (S.D.N.Y. 1999) ................................................................................. 24
*Stampf v. Long Island R. Co.*,
  761 F.3d 192 (2d Cir. 2014) ........................................................................................... 6, 7
*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003) ................................................................................................. Passim
*Styka v. My Merchants Servs. LLC*,
  2016 WL 3866550 (E.D.N.Y. July 13, 2016) ................................................................... 19
*Thomas v. iStar Fin., Inc.*,
  508 F. Supp. 2d 252 (S.D.N.Y. 2007) ............................................................................... 17
*Turley v. ISG Lackawanna, Inc.*,
  774 F.3d 140 (2d Cir. 2014) ..................................................................................... 10, 16
*Van Dusen v. Prywes*,
  223 Md. App. 778 (Md. Ct. Spec. App. 2015) ................................................................. 19
*Varriale v. Saratoga Harness Racing, Inc.*,
  429 N.Y.S.2d 302 (N.Y. App. Div. 1980) ........................................................................ 25
*Vasbinder v. Scott*,
  976 F.2d 118 (2d Cir. 1992) ..................................................................................... 14, 22
*Villalta v. JS Barkats, P.L.L.C.*,
  2021 WL 2458699 (S.D.N.Y. Apr. 16, 2021) ................................................................ Passim
*Williams by Williams v. Niske by Niske*,
  181 A.D.2d 307 (N.Y. App. Div. 1992) ..................................................................... 13, 14

## Statutes

42 U.S.C. § 1981a(b)(3) ............................................................................................... 17, 18
N.Y.C. Code § 8-126 ......................................................................................................... 18
N.Y. Gen. Oblig. Law § 15–108(a) .................................................................................. 13
N.Y. Penal Law § 110.05 .................................................................................................. 17
N.Y. Penal Law § 250.45 .................................................................................................. 17
N.Y. Penal Law §§ 80.00, 80.05 ...................................................................................... 17

## Rules

Fed R. Civ. P. 59(b) ........................................................................................................... 24

## Other Authorities

*H.L., v. Baker*,
  2021 WL 6549992 ............................................................................................................... 9

# I.    <u>INTRODUCTION</u>

As a matter of law, the jury's award of $780,000 in compensatory damages jointly against Defendants Danielle Esposito and Michael Esposito and $2,000,000 in punitive damages against Michael Esposito only is excessive under well-defined legal standards and cannot stand. The damages award can only be the result of passion or prejudice, provides for unconstitutional punitive damages that far exceed Mr. Esposito's net worth, and should be reduced to an amount that is within the range of what has been deemed reasonable in analogous cases. Additionally, the compensatory award must be reduced in the amount of Plaintiff's settlement with Co-Defendant Cultural Care, Inc. ("Cultural Care"). Thus, the Espositos request a remittitur of damages to no more than $169,770.75 in compensatory damages, minus the amount of the sealed settlement paid by Cultural Care, and no more than $70,000 in punitive damages. Alternatively, should Plaintiff decline to accept an appropriate remittitur, Defendants request a new trial on the issue of damages.

# II.    <u>FACTUAL BACKGROUND</u>

## A.    **Procedural Posture**

On September 20, 2021, Plaintiff instituted this action against her former employers, husband and wife Michael and Danielle Esposito ("Espositos"), and the au pair company that Plaintiff contracted with, Cultural Care. (ECF 1.) Plaintiff's claims arise from her discovery of a camera in her bedroom's smoke detector 18 days after she started living with the Espositos as their au pair. Plaintiff asserted three relevant claims: (1) violation of the New York State Human Rights Law ("NYSHRL") against the Espositos and Cultural Care; (2) violation of the New York City Human Rights Law ("NYCHRL") against the Espositos and Cultural Care; and (3) intentional infliction of emotional distress against Michael Esposito. *Id.* On December 13, 2023, the Court granted Plaintiff's Motion for Summary Judgment on liability for those three claims against the

Espositos based on Mr. Esposito's guilty plea in a separate criminal case.[1]  (ECF 75.) The Court also granted in part and denied in part Cultural Care's Motion for Summary Judgment.

Following the summary judgment order, Plaintiff and Cultural Care entered into a sealed settlement agreement, which was filed with the Court on August 22, 2024. (ECF 104.) The Court ordered a discontinuance as to Cultural Care without prejudice allowing Plaintiff to reopen the action within 60 days, *i.e.*, until November 2, 2024, if settlement was not consummated. (ECF 110.) Upon information and belief, Plaintiff and Cultural Care consummated the settlement involving a payment from Cultural Care to Plaintiff. On December 10, 2024, the Espositos filed a Letter Requesting Pre-Motion Conference in Connection with their Motion to Supplement Affirmative Defenses. (ECF 134.) Therein, the Espositos sought to supplement their Answer with an affirmative defense based on Plaintiff's recent settlement with Cultural Care. (*Id.*)

**B.      The Evidence at Trial**

Plaintiff's case against the Espositos proceeded to a four-day damages jury trial. At trial, Plaintiff testified that she contracted with Cultural Care to work as an au pair for the Espositos to assist in caregiving to their four young children (the Espositos had four boys at the time and five boys as of the jury trial). (Trial Transcript ("Tr.") 26:10-12, 422:3-6, attached as **Exhibit 1**.) Plaintiff began working for the Espositos on March 5, 2021. (Tr. 37:17-18.) Plaintiff had a room at the Espositos' home, which she testified was a "mansion" in a "rich" part of town. (Tr. 26:12-18, 30:1-10, 40:13-15.) According to Plaintiff, the Espositos "had money" and owned businesses. (Tr. 27:2-6.) Likewise, Plaintiff's counsel repeatedly made statements to the jury regarding the

---

[1] The Espositos appealed the summary judgment decision (ECF 76), but withdrew the appeal as premature because no final judgment had been entered, (ECF 77). Among other issues, Mrs. Esposito preserves her right to appeal summary judgment because she did not have sufficient privity with her husband in the criminal action to be collaterally estopped from presenting evidence concerning her husband's alleged actions. *See, e.g., I. Appel Corp. v. Katz*, No. 99–CIV, 1999 WL 287370, at *2 (S.D.N.Y. May 6, 1999). Accordingly, liability against Mrs. Esposito cannot be based on collateral estoppel, and she is entitled to present her defense on liability issues to a jury.

Espositos' wealth and "luxurious home." (Tr. 9:10-14.) In reality, the Espositos were living with Mrs. Esposito's parents while they saved money to buy and renovate their own home. (Tr. 360:20-21, 366:2-7.) Plaintiff lived with the Espositos for 18 days until she discovered, on March 23, 2021, that Mr. Esposito had installed a video recording device in her bedroom. (Tr. 54:4-55:17.)

After leaving Defendants' home, Plaintiff was employed at two different restaurants and as a laundry facility/factory worker. (Tr. 269:21-24, 281:10-16.) In December 2021, Plaintiff met her now-husband at a gym, and they were married six months after their first date. (Tr. 346:24-347:2.) Plaintiff's husband is an engineer for Public Service Enterprise Group Inc. (PSEG). (Tr. 356:21-24.) Plaintiff and her husband reside in a studio apartment unit of her in-law's home in New Jersey. (Tr. 356:13-20.) There was no testimony as to Plaintiff's current employment status.

According to Plaintiff, she suffered serious mental health problems including depression and anxiety after learning that she had been videotaped. Plaintiff's expert witness, Priska Imberti, a licensed clinical social worker, examined Plaintiff four times in late August 2022, at which time she was diagnosed with various mental illnesses. (Tr. 127:2-4, Pl.'s Ex. 10 (cited trial exhibits are appended hereto as **Exhibit 2**.) Regarding Plaintiff's current wellbeing, Imberti admitted that she could not opine because she had not examined Plaintiff in over two years. (Tr. 111:25-4.)

Plaintiff also presented the testimony of Dr. Okoye, who testified that she treated Plaintiff approximately one month after the incident for a period of seven weeks, from April 21, 2021, through June 8, 2021. (Tr. 221:23-222:2.) Dr. Okoye testified that Plaintiff "denied having any active suicidal ideation" and told her "that she would never actually kill herself, and would not do this to her family." (Tr. 205:24-206:5.) Dr. Okoye diagnosed Plaintiff with major depressive disorder and unspecified anxiety disorder and prescribed Plaintiff medication for those conditions. (Tr. 208:9-15, 211:4-6, 213:12-18.) Dr. Okoye did not diagnose Plaintiff with PTSD or adjustment

disorder with mixed anxiety and depressed mood. (Tr. 223:14-18.) Dr. Okoye further testified that she did not know what a "PCL-5" assessment is, *i.e.*, the assessment Imberti, relied on to evaluate Plaintiff in August 2022. (Tr. 219:9-10.) On June 18, 2021, Dr. Okoye's colleague, Dr. Jesus Pena-Mejia, noted in Plaintiff's medical records that Plaintiff experienced, "No panic attacks, No worry[,] No anxiety. No depression. good interest to activities. No suicidal or homicidal. Good energy. Good attention and concentration. Sleeping and eating well. No hallucination. No delusions. No manic. No aggressive." (Tr. 226:24-228:8; Pl.'s Ex. 11 at 35 of 43.) Similar notes followed on August 9, 2021. (Pl.'s Ex. 11 at 32 of 43.) Finally, on November 12, 2021, Dr. Pena-Mejia noted that Plaintiff's primary stress was "economical," she experienced depression "sometimes, [but reported] no loss of interest to activity," had good sleep and appetite, and an anxious mood. (Tr. Ex. 11 at 29.) The only evidence presented regarding Plaintiff's mental condition since August 2022 was testimony of Plaintiff and her husband, who testified that she takes daily medication. (Tr. 303:12-14; 354:22-355:1.) Plaintiff presented no medical records from any current (or recent) prescribing doctor or therapist.

There was no evidence that Mr. Esposito viewed or distributed any recordings of Plaintiff; indeed, it was Plaintiff's attorney who voluntarily shared the recordings to the New York Post for publication as part of Plaintiff's interview. (Tr. 323:16-324:11.) Plaintiff's expert testified that the Post article "exacerbated" Plaintiff's situation. (Tr. 129:15-24.) According to the medical records, her lawsuit was the source of Plaintiff's anxiety in August 2021. (Pl.'s Ex. 11 at 32 of 43.)

Following the trial, the jury awarded Plaintiff $780,000 in compensatory damages against Mr. and Mrs. Esposito, jointly. The jury also awarded Plaintiff punitive damages against Mr. Esposito totaling $2,000,000: $500,000 under New York Tort Law for the Intentional Infliction of Emotional Distress, $750,000 under the NYSHRL, and $750,000 under the NYCHRL. (ECF 126.)

## III.    LEGAL STANDARD

"While it is properly within the province of the jury to calculate damages, there is an upper limit, and whether that has been surpassed is not a question of fact with respect to which reasonable [persons] may differ, but a question of law." *Bouveng v. NYG Capital LLC*, 175 F. Supp. 3d 280, 327–28 (S.D.N.Y. 2016) (quotations omitted). "[W]hen a district court concludes that a damages award is excessive, it has discretion to either grant a new trial outright or to first give the plaintiff the option to accept a lower damages award through remittitur." *Cole v. Foxmar, Inc.*, No. 23-87, 2024 WL 74902, at *3 (2d Cir. Jan. 8, 2024), *cert. denied*, 144 S. Ct. 2528 (2024), *reh'g denied*, 144 S. Ct. 2720 (2024) . "On new trial motions, the trial judge may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner.*" Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012).

## IV.    ARGUMENT

A.    **The Law Requires Remittitur of the Jury's Excessive Compensatory Damages Award or a New Trial on the Issue of Damages.**

1.    **Applicable Legal Analysis for Remittitur of a Compensatory Damages Award.**

In this Circuit, the standard for remittitur of a compensatory damages verdict under New York substantive law where the jury verdict is not itemized is "whether the damages award is comparable to awards that have been granted in similar cases." *Ravina v. Columbia Univ.*, No. 16-CV-2137, 2019 WL 1450449, at *10 (S.D.N.Y. Mar. 31, 2019). In *Ravina*, the court rejected three proposed standards[2] and instead determined that "[t]he critical inquiry under either approach is to compare the damages awarded in this case to the damages awarded in cases involving similar injuries." *Id.* at *10. This is consistent with the standard uniformly applied in this Circuit. *See DiSorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir. 2003) ("Our determination of whether a compensatory

---

[2] In *Ravina*, the court rejected the application of (1) the federal "shocks the conscience" standard because New York substantive law governed; (2) the "deviates materially" test as it was for use only with a statutorily required itemized verdict; and (3) the *Transit Authority* test as a standard for a state agency. *Id.* at *9-10.

damages award is excessive . . . should include consideration of the amounts awarded in other, comparable cases." (internal quotations omitted)).[3] Because compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct," a plaintiff cannot obtain double recovery. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003).

### 2. Plaintiff Established No More Than $19,770.75 in Economic Damages.

To the extent the jury's verdict includes economic compensatory damages, the verdict is against the weight of the evidence.[4] Economic compensatory damages for employment discrimination generally consist of the plaintiff's back pay wages, calculated by multiplying the plaintiff's average weekly pay by the number of weeks between the date of plaintiff's termination and trial. *See Gutierrez v. Taxi Club Mgmt., Inc.*, 17-cv-532, 2018 WL 3432786, at *6 (E.D.N.Y. June 25, 2018), *R&R adopted*, 2018 WL 3429903 (E.D.N.Y. July 16, 2018).

Here, Plaintiff testified that she executed an agreement with Cultural Care to provide au pair services to the Espositos for one year at not less than $195.75 per week, "with the possibility to extend for a further six (6), nine (9) or twelve (12) months." (Tr. 331:11-333:3, Defs' Ex. F at ¶¶ 5, 12.) Plaintiff stopped working for the Espositos on March 23, 2021, so under her agreement, her back pay amounts to approximately $9,591.75 (49 weeks x $195.75) for the first year and $10,179.00 for the possible additional twelve months (52 weeks x $195.75), for a total of $19,770.75. This amount is subject to reduction by Plaintiff's actual earnings, which she failed to introduce proof of other than testifying that after March 23, 2021, she worked at a restaurant where

---

[3] Application of the "deviates materially" standard would still warrant remittitur. *See Stampf v. Long Island R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014) ("To determine whether a jury award is excessive within the meaning of § 5501(c), New York courts compare it with awards in similar cases.").

[4] Because the Court instructed the jury that in determining Plaintiff's compensatory damages, it "should consider the plaintiff's emotional pain and mental anguish as well as any mon[etary] loss" (Tr. 474:21-23), this Motion discusses potential economic damages, although the verdict did not itemize, nor did the Complaint specifically seek, such.

she was paid in tips, she was later paid $13 an hour in cash when she worked at a laundry facility/ factory starting before July 2022, and that she worked at a Colombian restaurant briefly. (Tr. 269:21-25, 277:16-18, 281:12, 327:22-328:10.)

Based on Plaintiff's wages while she was working for the Espositos, the $780,000 compensatory damages award is equivalent to more than 76 years of work as an au pair and more than 28 years in her most recent role. Therefore, the $780,000 compensatory damages award is against the weight of the evidence, warranting remittitur of the jury's verdict.

### 3. To the Extent the Jury Awarded Plaintiff Emotional Compensatory Damages, the Jury's Verdict is Excessive.

The Second Circuit instructs that even though "awards for mental and emotional distress are inherently speculative . . . 'a legal system has an obligation to ensure that such awards for intangibles be fair, reasonable, predictable, and proportionate.'" *Stampf*, 761 F.3d at 205 (quoting *Payne v. Jones*, 711 F.3d 85, 100 (2d Cir. 2013)). "Excessive awards for psychological and emotional distress not only disproportionally inflict harm on the tortfeasor and his or her dependants, they also impose burdensome costs on society." *Id.*

In this Circuit, emotional distress claims are grouped into three categories: "garden-variety," "significant," and "egregious." *Ravina*, 2019 WL 1450449, at *11. Garden-variety claims "are those in which the evidence of mental suffering is generally limited to the testimony of the plaintiff, who describes his or her injury in vague or conclusory terms." *Id.* (quotations omitted). Significant claims "are based on more substantial harm or more offensive conduct, are sometimes supported by medical testimony and evidence, evidence of treatment by a healthcare professional and/or medication, and testimony from other, corroborating witnesses." *Id.* (quotations omitted). Egregious claims "generally involve either 'outrageous or shocking' discriminatory conduct or a significant impact on the physical health of the plaintiff." *Id.* at *12 (quotations omitted).

a) ***The Compensatory Damages Award is Excessive When Compared to Similar Cases of Significant Distress.***

Based on the evidence presented at trial, Plaintiff experienced "significant" emotional distress. For reasonable emotional distress damages, this Court adheres to "the following scale: $6,500 to $46,000 for 'garden-variety' cases; $65,000 to $131,000 for 'significant' cases; and above $131,000 in 'egregious' cases." *Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 97 (E.D.N.Y. 2020).[5] Unlike this case, *Ravina* involved verbal and physical sexual assault, but the case is instructive because the court concluded that the plaintiff suffered "significant" emotional damages based on similar symptomology. 2019 WL 1450449, at *2-3. In *Ravina*, the plaintiff was working as an assistant professor when her supervisor physically and verbally sexually harassed her. *Id.* at *2-3. Ravina testified that she began to see a psychiatrist because of the harassment and that she continued therapy through the date of trial. *Id.* at *5. "She further testified that she suffered from insomnia, a herniated disc, anxiety, weight gain, and suicidal thoughts, and that this 'was an all-consuming situation that took over [her] life.'" *Id.* (alteration in original). Ravina's psychiatrist testified as to her medical condition from the time she experienced the harassment through the date of trial five years later:

> Ravina had suffered from "extreme anxiety, disturbed sleep, disturbed appetite, impaired ability to enjoy usually pleasurable activities, fears, distrust, aversion to social situations, at times she's felt suicidal, and deep concern about her long-term prospects to achieve success." He . . . had diagnosed her with generalized anxiety disorder, that her symptoms were "severe," and that her prognosis was "poor."

*Id.* at *6 (citation omitted). The court granted the defendant's motion for remittitur. *Id.* at *12.

Like Ravina, Plaintiff testified that at one point she suffered from anxiety and depression, but unlike Ravina, the Plaintiff here did not present any medical evidence corroborating that her

---

[5] Based on the inflation calculator used in *Antoine*, 489 F. Supp. 3d at 97 n.11, the present-day range of reasonable damages is $7,894.09 to $55,865.87 for 'garden-variety' cases; $78,940.90 to $159,096.27 for 'significant' cases; and above $159,096.27 in 'egregious' cases." *See* CPI Inflation Calculator, https://www.bls.gov/data/inflation_calculator.htm (last visited Dec. 8, 2024).

symptoms are ongoing. Plaintiff's expert witness could not provide an opinion on Plaintiff's status after August 2022, and Plaintiff's treating physician testified that she had not seen Plaintiff since June 2021. (Tr. 111:25-4.) Thus, Plaintiff presented evidence of "significant" emotional distress damages from March 2021 through August 2022.

The jury's award of $780,000 in compensatory damages far exceeds the upper limit of claims involving analogous evidence of emotional distress.[6] For instance, in *Sawicka v. Catena*, 79 A.D.3d 848, 849 (N.Y. App. Div. 2010), two plaintiffs sued their employer for intentional infliction of emotional distress and constructive discharge because the employer installed a video camera in the workplace restroom "to surreptitiously view and record the plaintiffs while they used the restroom." *Id.* at 850. The jury awarded one plaintiff $100,000 in compensatory damages and $250,000 in punitive damages and the other plaintiff $150,000 in compensatory damages and $250,000 punitive damages. *Id.* at 849.[7]

The case of *Offei v. Omar*, No. 11 Civ 4283, 2012 WL 2086294, at *8 (S.D.N.Y. May 18, 2012), *R&R adopted*, 2012 WL 2086356 (June 8, 2012) also provides guidance of reasonable damages in cases involving analogous psychological symptoms. In *Offei*, the court determined that $250,000 in compensatory damages was appropriate for the mental distress suffered by a hotel housekeeper following sexual assault of unwanted kissing, touching, and hugging from a hotel guest. *Id.* In doing so, the court looked at other cases involving comparable psychological injury, such as "employment discrimination or forced labor that triggered anxiety, depression and other parallel emotional phenomena and sometimes required treatment and even medication." *Id.* at *6.

---

[6] Attached hereto as **Exhibit 3** is Defendants' Appendix of cases involving claims of psychological symptoms similar to the Plaintiff in this case, and the corresponding jury awards in each case.

[7] The jury's award is also excessive compared to like cases in other jurisdictions. *See, e.g., H.L., v. Baker, 2021 WL 5112577 (Wash. Super. Aug. 19, 2021)* (award of $170,000 in compensatory damages to 17-year-old foreign student who discovered hidden camera in alarm clock in her private living space in home of college director ), *see also H.L., v. Baker, JVR* No. 2201190022, 2021 WL 6549992.

Such cases "result in awards in the lower six figures, particularly where the harm was suffered over an extended period of time," and are lower "in cases not involving a sexual-assault component." *Id.* (citing cases). The plaintiff's symptoms in *Offei* were nearly identical to the symptoms and conditions claimed by Plaintiff in this case. Particularly, both plaintiffs provided evidence of anxiety, panic attacks, sleep disturbances, weight loss, psychological treatment, medication, and an inability to work of several months. *Id.* at *3, 6. Importantly, unlike in *Offei*, the Plaintiff in this case did not allege that Mr. Esposito physically assaulted her. *See also Gutierrez*, 2018 WL 3432786, at *9-10 (awarding $130,000 as "reasonable" and "at the upper end of the 'significant' claim range" in emotional distress damages for sexual harassment where plaintiff testified that she felt "'uncomfortable' and 'sick,' cried at work, had migraine headaches, routinely felt nauseous, vomited, had trouble sleeping, suffered from stress and anxiety, overate, and felt a general sensation of helplessness" (collecting cases)).

Based on, *Sawicka, Offei*, *Gutierrez,* and other analogous cases (*see* Ex. 3), remittitur of the compensatory damages award to $150,000 or less for emotional distress is appropriate.[8]

**b)    *Even if Plaintiff had Presented Evidence of "Egregious" Emotional Distress, the Compensatory Damages Award Would Still Be Excessive.***

The compensatory damages award of $780,000 exceeds the upper limits of "egregious" emotional distress claims in this Circuit. *See, e.g.*, *Ravina*, 2019 WL 1450449, at *12 ("Awards for [egregious emotional distress] claims can far exceed $ 200,000, with awards of over $ 1 million reserved for the most egregious cases."); *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 163 (2d Cir. 2014) (upholding an award of $1.32 million in compensatory damages for a "unique" case "combining years of grotesque psychological abuse leading to a marked decline in [plaintiff's]

---

[8] In *Ravina*, the court remitted the jury's compensatory award from $750,000 to $500,000 and the punitive damages award from $500,000 to $250,000. 2019 WL 1450449, at *9, *12-13. Notably, the compensatory award in *Ravina* was so high only because it addressed both emotional distress *and* "substantial reputational harm." *Id.* at *13.

mental health and well-being," while "acknowledg[ing] that the jury's compensatory award tests the boundaries of proportionality and predictability").

For instance, in *Villalta v. JS Barkats, P.L.L.C.*, the plaintiff presented evidence of egregious emotional distress. No. 16CV2772, 2021 WL 2458699, at *15 (S.D.N.Y. Apr. 16, 2021), *R&R adopted*, No. 16-CV-2772, 2021 WL 2458023 (S.D.N.Y. June 16, 2021). There, the plaintiff sued her former employer for egregious acts of *quid quo pro* sexual harassment, including multiple rapes, ongoing harassment via text message and social media posts, threatening to disseminate revenge porn, attempting to obstruct justice by paying the plaintiff to change her testimony, creating a hostile work environment, and fleeing the country to escape punishment. *Id.* at *1. The court awarded the plaintiff $350,000 in compensatory damages and $700,000 in punitive damages. *Id.* at *36-54. *See also Angulo v. 36th Street Hospitality LLC*, No. 19 CIV 5075, 2020 WL 4938188, at *13 (S.D.N.Y. July 31, 2020), *R&R adopted*, No. 19CIV5075, 2020 WL 4936961 (S.D.N.Y. Aug. 24, 2020) (recommending $300,000.00 in a "significant"/"egregious" emotional distress damages brought by a waitress who was raped by her supervisor, leading to suicide attempts, psychiatric hospitalizations, and substance abuse, all corroborated by medical evidence); *Garcia v. Comprehensive Ctr., LLC*, No. 17-CV-8970, 2019 WL 8274296, at *8 (S.D.N.Y. Nov. 21, 2019), *R&R adopted*, No. 17-CV-8970, 2020 WL 1435002 (S.D.N.Y. Mar. 24, 2020) (recommending $175,000 in compensatory damages where circumstances were "in some respects 'egregious,'" where plaintiff suffered physical violence as well as verbal harassment for an extended period including being punched in the face, fingers slammed in her laptop, and grabbed by her shirt collar and dragged into supervisor's office); *Caravantes v. 53rd Street Partners, LLC*, No. 09 Civ. 7821, 2012 WL 3631276 (S.D.N.Y. Aug. 23, 2012) (awarding $150,000 in an "egregious" case where employee was subjected to repeated genital touching, corroborated by

11

video evidence, including non-consensual oral and anal sex initiated by the employer).

Although admittedly difficult to categorize, Defendants contend that Plaintiff did not establish "egregious" emotional distress. Unlike other "egregious" cases, there was no evidence of physical assault, rape, or abuse. *See Caravantes*, 2012 WL 3631276 (egregious emotional distress caused by oral and anal rape and repeated genital touching on video tape); *Villalta*, 2021 WL 2458699 (forced or coerced sexual acts and threatened dissemination of videos of the assaults). Further, Plaintiff did not present independent evidence of ongoing debilitating or permanent effects to her lifestyle, prolonged mental harm, or any long-term prognosis. *See Caravantes*, 2012 WL 3631276, at *22, *24. Here, Plaintiff has established a successful life for herself since the incident. In December 2021, she met Juan Matallana, a civil engineer, at the gym and began dating him in January 2022. (Tr. 346:20-23, 348:4-11.) Mr. Matallana and Plaintiff married six months later on July 24, 2022. (Tr. 319:14-18.) Plaintiff also was able to obtain subsequent employment in a restaurant and a laundry facility or factory. (Tr. 269:21-25, 277:16-18, 281:12, 327:11-23.) Plaintiff only apparently ceased working after meeting her husband.

No medical provider testified that Plaintiff was currently unable to maintain employment due to ongoing mental distress. Plaintiff provided no evidence of ongoing treatment. Her physician, Dr. Okoye, treated her over the course of seven weeks until June 8, 2021. (Tr. 221:23-222:9.) Plaintiff did not present testimony or records from any treating provider after November 2021. (*See* Pl.'s Ex. 11.) Plaintiff's expert testified that she attended therapy from April to September 2021 and had no opinion on Plaintiff's status after August 2022. (Tr. 128:4-6; Tr. 111:25-4.) Plaintiff and her husband's testimony that she has ongoing depression and anxiety, proves only garden-variety emotional distress. *Ravina*, 2019 WL 1450449, at *11. Accordingly, the evidence was sufficient to establish significant damages, not egregious emotional distress.

Even assuming, *arguendo*, that Plaintiff's emotional distress evidence shaded towards "egregious," cases like *Angulo*, *Garcia*, *Caravantes*, and *Villalta* call for an award of damages ranging from $150,000 to $350,000. Accordingly, the jury's compensatory damages award of $780,000 is excessive.

### 4. Under New York Law, the Verdict Must Be Reduced by the Amount of Plaintiff's Settlement with Co-Defendant Cultural Care.

New York law requires that the compensatory damages award against the Espositos be reduced in the amount of the consideration paid by Cultural Care to Plaintiff to obtain a release. N.Y. Gen. Oblig. Law § 15–108(a). "[T]he permitted reduction is the greatest of the amount stipulated as consideration for the release, the amount actually paid for the release, or the settling tortfeasor's equitable share of the damages." *Barkley v. United Homes, LLC*, 848 F. Supp. 2d 248, 257 (E.D.N.Y. 2012), *aff'd sub nom. Barkley v. Olympia Mortg. Co*., 557 F. App'x 22 (2d Cir. 2014), *as amended* (Jan. 30, 2014). Reducing the verdict by the amount of settlement "takes into account the very substantial probability that some percentage of fault would have been attributed to the settling defendant had the issue been presented to the trier of fact." *Williams by Williams v. Niske by Niske*, 181 A.D.2d 307, 311 (N.Y. App. Div. 1992), *aff'd*, 81 N.Y.2d 437 (1993).

Section 15–108 applies when the claim against the settling and non-settling defendants is for the "same injury," though it need not be the same cause of action. *Barkley*, 848 F. Supp. 2d at 266. "It is well settled that 'when a plaintiff seeks compensation for the same damages under different legal theories of wrongdoing, the plaintiff should receive compensation for an item of damages only once.'" *Id.* at 257. Notably, Section 15-108 is read broadly to apply to "any situation in which two or more persons can be held liable for causing the same injury," such as claims involving statutory violations as well as torts. *Mathis v. United Homes, LLC*, 607 F. Supp. 2d 411, 430 (E.D.N.Y. 2009). When a co-defendant's settlement agreement is filed under seal, a court can

still rely on the sealed agreement to enter a separate order, under seal, setting forth the set-off calculations. *Barkley*, 848 F. Supp. 2d at 267.

Here, Plaintiff's Complaint asserted NYSHRL and NYCHRL against all three Defendants, an intentional infliction of emotional distress claim against Mr. Esposito, and a Title VII claim against only Cultural Care. (ECF 1.) Plaintiff alleged the same harm against all three Defendants. (*Id.* ¶¶ 41-44.) Because Plaintiff and Cultural Care settled weeks before trial, the jury did not hear that Plaintiff brought her claims under the NYSHRL and NYCHRL against Michael Esposito, Danielle Esposito, and Cultural Care, jointly. Nor did the jury hear that Cultural Care and Plaintiff settled for an undisclosed amount before trial for the same claimed injuries that were at issue in the trial. There is a "very substantial probability that some percentage of fault would have been attributed to [Cultural Care] had the issue been presented to the [jury]." *Williams*, 181 A.D.2d at 311. The jury's verdict did not itemize the compensatory damages among the three claims faced by the Espositos nor did it apportion the damages between them. Plaintiff did not claim that separate Defendants caused her to suffer different damages. As such, because Plaintiff settled her claim for damages against Cultural Care, the compensatory damages award against the Espositos must be offset in the amount of Cultural Care's settlement consideration.

**B.    The Punitive Damages Award is Excessive and Should Be Reduced.**

**1.    The $2,000,000 Punitive Damages Award Is Grossly Excessive and Arbitrary, and Thus Constitutes an Unconstitutional Deprivation of Property.**

Punitive damages are intended to punish the tortfeasor and deter similar conduct. *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir. 1992). "While States possess discretion over the imposition of punitive damages, it is well established that there are procedural and substantive constitutional limitations on these awards." *Campbell*, 538 U.S. at 416. "The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *Id.* "To the extent an award is grossly excessive, it furthers no legitimate purpose and

constitutes an arbitrary deprivation of property." *Id.* at 417.

To address the foregoing concerns, the Supreme Court has "instructed courts reviewing punitive damages to consider three guideposts [the "*Gore* guideposts"]: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* (citing *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

*a)*     ***The Reprehensibility of the Defendant's Misconduct.***

With respect to the defendant's conduct, the Court instructs trial courts to consider:

> whether: the harm was physical rather than economic; the tortious conduct
> evinced an indifference to or a reckless disregard of the health or safety of
> others; the conduct involved repeated actions or was an isolated incident;
> and the harm resulted from intentional malice, trickery, or deceit, or mere
> accident.

*Campbell*, 538 U.S. at 409. A repeated, dangerous pattern will justify a large punitive damages award, while reckless, intentional, but otherwise isolated action, will not. *See Cole*, 2024 WL 74902, at *3. Here, Mr. Esposito's conduct was deceitful and done with apparent disregard, but it did not involve a physical attack, unlike the cases in this Circuit that were categorized as "egregious" and warranted punitive damages over $350,000. *See, e.g.,* Ex. 3. Further, Mr. Esposito's conduct was an isolated incident. There is no evidence that Mr. Esposito had previously engaged in similar conduct nor that suggests Mr. Esposito would engage in such conduct again. Indeed, Mrs. Esposito testified as to the significant negative impact on their lives, their business, and their five children. (Tr. 417:22-419:14.) Mr. Esposito voluntarily pled guilty in the criminal prosecution, and has faced no similar charges since the 2021 incident. There is also no evidence of Mr. Esposito watching or disseminating any private videos of Plaintiff. Indeed, Plaintiff testified that the only dissemination that occurred was because *Plaintiff's counsel* provided the recordings

to the New York Post, to whom Plaintiff gave a voluntary interview. (Tr. 323:16-324:11.) Thus, under *Gore*, Mr. Esposito's isolated conduct, while in no way excusable, does not weigh in favor of one of the highest, if not *the* highest, punitive damages award in this Circuit for a case that did not involve physical violence. *See, e.g.,* Ex. 3.

b)      **The Punitive Damages Are Out of Line With the Appropriate Compensatory Award In This Case and Against the Weight of the Evidence of Plaintiff's Actual Harm.**

The second *Gore* guidepost looks at "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award." *Campbell*, 538 U.S. at 418. After the necessary remittitur, there is an unconstitutional disparity between the compensatory damages award and the $2,000,000 punitive damages award. *See Qorrolli v. Metro. Dental Assocs., D.D.S. - 225 Broadway, P.C.*, No. 18CV6836, 2022 WL 17689836, at *11 (S.D.N.Y. Dec. 15, 2022) (ratio between a $2,000,000 award and reduced "reasonable amount of compensatory damages climbs quickly into the double digits -- a ratio that is not only excessive, but constitutionally suspect").

Although courts have not adopted a "bright line" ratio, punitive damages in excess of four times the compensatory damages are most likely unconstitutional. *See Campbell*, 538 U.S. at 425. Moreover, in cases such as this where "compensatory damages include an amount for emotional distress," the compensatory damages "likely [are] based on a component which was duplicated in the punitive award," which further supports a reduction of punitive damages. *Id.* at 426. Thus, the second *Gore* guidepost weighs in favor of reducing the punitive damages award.

c)      **The Difference Between the Jury's Punitive Damages Award and the Civil and Criminal Penalties Authorized or Imposed in Comparable Cases Warrants Remittitur.**

The Supreme Court's third *Gore* guidepost is "the disparity between the punitive damages award and the civil penalties authorized or imposed in comparable cases," in addition to the "criminal penalties that could be imposed." *Campbell*, 538 U.S. at 428 (citation omitted); *see also Turley*, 774 F.3d at 164 ("We exercise relatively stringent control over the size of punitive awards

16

in order to ensure that such damages are fair, reasonable, predictable, and proportionate, to avoid extensive and burdensome social costs, and to reflect the fact that punitive awards are imposed without the protections of criminal trials."). If the criminal or civil "penalties for comparable misconduct are much less than a punitive damages award, the tortfeasor lacked fair notice that the wrongful conduct could entail a sizable punitive damages award." *DiSorbo*, 343 F.3d at 187.

Here, Mr. Esposito pled guilty to a class E felony of unlawful surveillance and class A misdemeanor of attempted unlawful surveillance for the same conduct that is the subject of this civil lawsuit. *See* N.Y. Penal Law § 110.05; N.Y. Penal Law § 250.45. Under New York penal law, the fine for felony unlawful surveillance shall not exceed $5,000 or double the amount of the defendant's gain from the commission of the crime and a fine for misdemeanor attempted unlawful surveillance shall not exceed $1,000. N.Y. Penal Law §§ 80.00, 80.05.

In addition to criminal financial penalties, courts will look at any available civil penalties in considering excessiveness. For instance, Section 1981(a) of Title VII caps compensatory and punitive damages at $50,000 where defendant employed 15 to 100 employees, $100,000 for 101-200 employees, $200,000 for 201 to 500 employees, and $300,000 for more than 500 employees. 42 U.S.C. § 1981a(b)(3). Courts frequently look at the amount of compensatory and punitive damages available under the federal law as a guidepost on the amount of punitive damages under New York law. *See Thomas v. iStar Fin., Inc.*, 508 F. Supp. 2d 252, 263 (S.D.N.Y. 2007) (ordering remittitur of $1,600,000 in punitive damages to $190,000 in case of race discrimination and retaliation). Although there is no cap under New York City or state law, "the federal cap nonetheless provides guidance on what is considered an appropriate civil penalty for comparable misconduct." *Id.* Notably, the federal cap is in line with civil penalties that the Commission may impose under the NYCHRL in the amounts of "not more than $125,000" for unlawful

discrimination or $250,000 for "willful, wanton or malicious" conduct. N.Y.C. Code § 8-126.

In the instant case, the punitive damages award of $2,000,000 far exceeds comparable penalties. The $5,000 maximum fine under New York penal law did not place Mr. Esposito on notice that his conduct could lead to a $2,000,000 punitive damages award, and thus supports reducing the punitive damages award. *See DiSorbo*, 343 F.3d at 187. Further, the New York City civil penalty and the Title VII cap counsel in favor of reducing punitive damages well below $250,000. 42 U.S.C. § 1981a(b)(3)(D) (setting $50,000 damages cap for small employer); N.Y.C. Code § 8-126 (permitting fine of $125,000 for unlawful discrimination or $250,000 for willful, wanton or malicious acts); *see also Ravina*, 2019 WL 1450449, at *15 ("award of $ 250,000, reflecting the maximum civil city law penalty, 'would be maximally sufficient to serve the retributive and deterrent purposes of civil penalties without violating due process principles.'"; *Qorrolli*, 2022 WL 17689836, at *11 (maximum civil penalty of $250,000 under the NYCHRL "do[es] not justify a $2,000,000 punitive damages award").

More significantly, the jury's award is not in line with the punitive damages awarded in similar cases in this Circuit. "Courts also review the punitive damages awards in similar cases in order to gauge whether a particular punitive award is excessive." *Villalta*, 2021 WL 2458699, at *18. Here, the Court should reduce the punitive damages award in this case because it is excessive in comparison to similar cases. *See Sawicka*, 79 A.D.3d 848 (awarding plaintiffs who were unlawfully surveilled in restroom by employer $150,000 and $250,000, respectively, in punitive damages); *Ravina*, 2019 WL 1450449, at *18 (reducing a $500,000 punitive damages award to $250,000); *Angulo*, 2020 WL 4938188, at*19 (awarding $100,000 in punitive damages where Plaintiff was raped by her supervisor, leading to suicide attempts, psychiatric hospitalizations, and substance abuse); *Garcia*, 2019 WL 8274296, at *9 (awarding $75,000 in punitive damages for

18

Plaintiff who was physically abused by employer); *Van Dusen v. Prywes*, 223 Md. App. 778 (Md. Ct. Spec. App. 2015) (plaintiffs, who were surreptitiously videotaped by their landlord via a hidden camera in the room they rented, were awarded, respectively, $341,275 and $301,429.17 in compensatory damages, and $300,000 and $100,000 in punitive damages).

Indeed, the $2,000,000 punitive damages award here is excessive compared to even the most egregious cases in this Circuit. *See, e.g., Caravantes*, 2012 WL 3631276, at *26 ($40,000 in punitive damages to plaintiff who was forced to engage in sexual acts with his manager almost daily for more than two years); *Styka v. My Merchants Servs. LLC*, No. 14-CV-6198, 2016 WL 3866550, at *4 (E.D.N.Y. July 13, 2016) ($50,000 in punitive damages where supervisor made "crude verbal comments," "physically forced himself on [the plaintiff] in the workplace by kissing her or grabbing her breasts, thighs, or buttocks" for approximately five months, and terminated her employment for refusing to have sex with him); *Offei*, 2012 WL 2086294, at *1-4, *8 ($100,000 in punitive damages where defendant sexually assaulted plaintiff leading to panic attacks, hospital treatment, and anti-anxiety medication); *Villalta*, 2021 WL 2458699, *1, 24 ($700,000 in punitive damages for sexual harassment including sexual assaults, ongoing text message and social media harassment, threatening to disseminate revenge porn, attempting to obstruct justice, and fleeing the country to escape punishment ); *Antoine*, 489 F. Supp. 3d at 102 ($375,000 in punitive damages for "egregious case" where employer sexually assaulted and strangled her, threatened her family, and withheld pay to compel sexual favors).

Given that the jury's punitive damages verdict in this case exceeds the bounds of what has been awarded in similar and even significantly more egregious cases, it is likely that the jury's verdict was influenced by passion or prejudice. On this point, the Supreme Court has stated:

> Although these awards serve the same purposes as criminal penalties, defendants subjected to punitive damages in civil cases have not been accorded the protections applicable in a

criminal proceeding. This increases our concerns over the imprecise manner in which punitive damages systems are administered. We have admonished that "[p]unitive damages pose an acute danger of arbitrary deprivation of property. . . . Our concerns are heightened when the decisionmaker is presented, as we shall discuss, with evidence that has little bearing as to the amount of punitive damages that should be awarded. Vague instructions, or those that merely inform the jury to avoid "passion or prejudice," . . . do little to aid the decisionmaker in its task of assigning appropriate weight to evidence that is relevant and evidence that is tangential or only inflammatory.

*Campbell*, 538 U.S at 417–18 (2003).

Here, Plaintiff and Plaintiff's counsel made unsupported statements throughout the trial that were highly prejudicial to Defendants and played to the passions of the jury, directly correlating to the jury's unconstitutionally excessive verdict. For instance, during his opening statement, Plaintiff's counsel painted Mr. Esposito as a sexual predator, announcing that the evidence would show that Mr. Esposito acted on "his perverse sexual desires," and insinuating that he showed the videos to his friends at a bar. To the contrary, there was no testimony or evidence that Mr. Esposito's motives were sexual in nature. Nor is there any evidence that Mr. Esposito possesses the videos or that anyone besides the jury and Plaintiff's counsel has seen all of the videos. (Tr. 7:12-17, 10:20-11:2.) It is likely that the jury was further inflamed because they were permitted to view in the jury room all of the recordings. (Tr. 265:10-266:1.). In his closing argument, Plaintiff's counsel's appealed to the jury's emotion and passion when he stated that the Plaintiff was filmed approximately 2,000 times without her consent, and suggested that she was entitled to $4-5 million dollars in damages. In reality, Plaintiff was not present in the majority of the recordings are her empty room. (Tr. 428:19-25.) Without any basis, Plaintiff's counsel also told the jury, "I can promise you that [Defendants] will continue to think that this kind of conduct is acceptable" and referred to Mr. Esposito's criminal consequences as a "slap on the wrist," and "no real consequence." (Tr. 430:6-17.) Plaintiff's counsel further inflamed the jury, encouraging them to think what if "this happened to my wife; my sister; my daughter" and calling for empathy

for the Plaintiff "feel[ing] 100 percent useless. . . can you imagine how that must feel, that the pain is so bad that you want to end your life." (Tr. 428:8-18, 431:17-19.)

Additionally, Plaintiff and Plaintiff's counsel repeatedly made unsubstantiated references to Defendants' wealth, likely leading the jury to believe that Mr. Esposito could afford to pay a $2,000,000 damages award, even though the only evidence presented as to Defendants' wealth was that Defendants were living with Mrs. Esposito's parents until they could afford to purchase their own home. Plaintiff was also permitted to testify, over objection, that her father, who had cancer and lived in Colombia, died because of Mr. Esposito's actions. (Tr. 286:7-287:10.) The inflammatory and unsupported statements served only to appeal to the jury's sympathy, resulting in a punitive damages award that violates Due Process. *See Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 541 (2d Cir. 1992) ("Comments that improperly play to the sympathy of a jury may not be justified because of a tenuous substantive connection to a legal issue present in the case.").

In light of the range of permissible punitive damages between $10,000 to $500,000 seen in comparable cases, the $2,000,000 punitive damages award against Mr. Esposito is excessive and must be reduced.

### 2.    The Punitive Damages Award Must Be Reduced Because It Constitutes a Disproportionately Large Percentage of Defendant's Net Worth.

A court is required to consider evidence of the defendant's "personal financial situation" to determine whether the award is excessive. *Patterson v. Balsamico*, 440 F.3d 104, 121-22 (2d Cir. 2006) ("We have 'recognize[d] that one purpose of punitive damages is deterrence, and that deterrence is directly related to what people can afford to pay.'" (alteration in original) (quoting *Lee v. Edwards*, 101 F.3d 805, 813 (2d Cir. 1996)); *see also Menghi v. Hart*, 745 F. Supp. 2d 89, 110 (E.D.N.Y. 2010), *aff'd*, 478 F. App'x 716 (2d Cir. 2012) ("the court must still consider [the defendant's] financial circumstances in assessing the amount" of punitive damages).

"The Second Circuit has indicated that it *will not* 'affirm punitive damages awards that result in the financial ruin of the defendant or constitute a disproportionately large percentage of the defendant's net worth.'" *Id.* (quoting *Patterson*, 440 F.3d at 122) (emphasis added). In *Vasbinder*, the court considered each defendant's income, home equity, savings, and liabilities, including any mortgage, car loans, annual property taxes, and the cost of children's education through college. 976 F.2d at 120. The court concluded that a punitive damages award that would consume 30% to 50% of the defendants' net worth "'shocks the judicial conscience' because it far exceeds what is needed to deter the defendants or similarly situated individuals from engaging in the wrongful conduct addressed in this action." *Id.* at 121 (remitting punitive damages to around 6-7% of defendants' net worth); *see also Menghi*, 745 F. Supp. 2d at 110 (reducing $2,000,000 punitive damages award to $100,000 after considering defendant's annual salary of $20,800). "Thus, while a defendant's conduct is obviously germane to the damages issue, even outrageous conduct will not support an oppressive or patently excessive award of damages." *Vasbinder*, 976 F.2d at 121 (internal marks and citation omitted). "Further, because neither compensation nor enrichment is a valid purpose of punitive damages, an award should not be so large as to constitute a windfall to the individual litigant." *Id.* (internal marks and citation omitted).

Applying these principles to the instant case, the jury's punitive damages award far exceeds Mr. Esposito's net worth and must be reduced. As reflected in the Declaration of Michael Esposito attached hereto as **Exhibit 4**, as of November 30, 2024, Mr. Esposito's net worth is $695,387. (Ex. 4 at Ex. A). According to the 2023 tax return attached to Mr. Esposito's Declaration as Exhibit B, the Espositos joint adjusted gross income in 2023 was $70,128. (Ex.4 at Ex. B, at 46.) The punitive damages award of $2,000,000, which is almost three times Mr. Esposito's net worth, will clearly result in the financial ruin of Mr. Esposito and his family of seven.

At trial, the jury was likely misled by Plaintiff's and Plaintiff's counsel's statements relating to Defendants' perceived wealth, of which there was no evidence. The primary reference to wealth related to Defendants' "mansion," but in reality, Defendants were living in Mrs. Esposito's parents' home from September 2016 through the date of the subject incident in March 2021. (Tr. 360:20-21; 365:22-366:20.) Mrs. Esposito testified that she, her husband, and their first son moved in with Mrs. Esposito's parents in September 2016 when she was pregnant with her second son to save money to purchase a home for their growing family (Tr. 365:22-366:7.) In November 2017, while still living with her parents, Mrs. Esposito purchased a new home, financing the purchase with a mortgage, sales proceeds from the previous home, and a family loan. (Tr. 375:14-376:7.) Subsequently, the Espositos took out an additional mortgage to renovate their new home after discovering extensive mold throughout the house and other issues. (Tr. 376:11-17.) Defendants introduced evidence of $650,000 in mortgages for their new home and repairs thereto, which mortgages were obtained before this lawsuit was initiated. (Tr. 378:9-23, Defs.' Ex. I.) Mrs. Esposito also testified as to the Espositos' financial decline since March 2021 as a result of Mr. Esposito's criminal trial and this case, stating that their La Rosa Chicken & Grill franchise locations received a lot of "backlash" and "hate" and that the community no longer wanted to support the Espositos' business. (Tr. 419:6-14.) Mrs. Esposito's testimony is consistent with the Espositos' 2023 tax return, which reflects that one of their La Rosa franchises earned $13,581 in nonpassive income in 2023, while the second franchise did not earn any nonpassive income and suffered a loss of $6,880. (Ex. 4 at Ex. B, at 40-41.) Mr. Esposito also has five children ranging from 2 to 10 years of age who will require financial support from Mr. Esposito's earnings for many more years. (Tr. 360:10-16.) Accordingly, the punitive damages award against Mr. Esposito should be reduced to no more than 10% of his net worth, *i.e.*, approximately $70,000.

**C.    A New Trial on the Issue of Damages Is Warranted Based On Plain Errors That Occurred During Trial, Which Affected Defendants' Substantial Rights And Inflamed The Passions Of The Jury.**

A new trial is justified where plain error seriously affected fairness, integrity, or public reputation of judicial proceedings. *Sharkey v. Lasmo (Aul Ltd.)*, 55 F. Supp. 2d 279, 290 (S.D.N.Y. 1999), *aff'd*, 214 F.3d 371 (2d Cir. 2000); *see also* Fed R. Civ. P. 59(b). Plain error is: "(1) an error (2) that is plain, (3) that prejudicially affected the defendant's 'substantial rights' and (4) that 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.'" *Kogut v. Cnty. of Nassau*, 789 F.3d 36, 45 (2d Cir. 2015). A judge presiding over a trial must "exercise [a] degree of control required . . . to assure the litigants of a fair trial," which is "the single most important task of a district judge." *Koufakis v. Carvel*, 425 F.2d 892, 900–01 (2d Cir. 1970). This obligation exists regardless of whether "objections are raised by one of the litigants or his counsel." *Id.* (emphasis added). In *Koufakis*, the appellant argued that the conduct of appellees' counsel during trial was "so improper and prejudicial that the trial judge's refusal to grant appellants' motion for a new trial was an abuse of discretion." *Id.* at 900.

In addition to the inflammatory nature of Plaintiff's counsel's comments discussed *supra* §IV(B)(1)(c), allowing Plaintiff to testify, over objection, that her father who lived in Colombia was not killed by his cancer, but by what Mr. Esposito "did to [Plaintiff]" was error. (Tr. 286:7-287:10.) While it may be what she understandably believes, Plaintiff did not provide any evidence to corroborate her statement that her father's "stress" about what happened to Plaintiff caused "a blood vessel [to] burst in his heard, which is what caused him to pass away." *Id.*

Furthermore, admitting statements about the Espositos' purported wealth over Defendants' objection was also in error. (Tr. 29:24-30:3). Plaintiff and Plaintiff's counsel repeatedly emphasized the purported wealth of the Defendants, claiming that they "lived in a large and luxurious home" with waitstaff and a movie theatre while Plaintiff "slept on the street." (Tr. 9:9-

14, 430:17-19.) Not only did such statements mischaracterize Defendants' wealth, but New York law is clear that evidence of the wealth of a defendant is wholly irrelevant and should not be submitted to a jury unless and until a jury has brought a special verdict that plaintiff is entitled to punitive damages. *Rupert v. Sellers*, 368 N.Y.S.2d 904. 911-912 (N.Y. App. Div. 1975); *see also Dufresne v. Duemler*, 485 N.Y.S.2d 879, 880 (N.Y. App. Div. 1985) (defendant's financial resources irrelevant to compensatory damages) (citing *Rupert*); *Varriale v. Saratoga Harness Racing, Inc.*, 429 N.Y.S.2d 302, 303 (N.Y. App. Div. 1980) (same, reversing jury verdict). The Second Circuit firmly rejected these tactics, explaining that "[r]emarks such as these, which can be taken as suggesting that the defendant should respond in damages because he is rich and the plaintiff is poor, are grounds for a new trial." *Koufakis*, 425 F.2d at 902 (emphasis added).

The admission of testimony, evidence, and argument about Plaintiff's father's death, Defendants' purported wealth, and Mr. Esposito's conduct as discussed here and in § IV(B)(1)(c) constituted plain error requiring a new trial on the issue of damages.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, Defendants request that the Court enter a remittitur of damages to no more than $169,770.75 in compensatory damages, minus the amount of the sealed settlement paid by Cultural Care, and no more than $70,000 in punitive damages. In the alternative, the Espositos request a new trial on the issues of damages.

Dated: December 10, 2024

*/s/ Daniel A. Schnapp*
Daniel A. Schnapp
Dentons US LLP
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 398-7630
Fax: (212) 768-6800
Email: daniel.schnapp@dentons.com

*Attorneys for Defendants, Michael Esposito and Daniel Esposito*